Filed 10/8/15  Rosenberg v. Reid CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SHERYL ROSENBERG, | B256895 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BP140257) |
| v. | |
| BRIGETTE REID, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Lesley C. Green, Judge.  Affirmed.

Greenberg Traurig and Frank E. Merideth, Jr. for Plaintiff and Appellant.

Loeb & Loeb, Gabrielle A. Vidal, Rachel J. Harris, and Amy L. Koch for Defendant and Respondent.

_____

# INTRODUCTION

This is an appeal from an order striking a complaint pursuant to California's anti-strategic lawsuit against public participation (anti-SLAPP) statute (Code Civ. Proc., § 425.16).[1] We affirm.

Plaintiff Sheryl Rosenberg and Defendant Brigette Reid are sisters and beneficiaries under the trust established by their late father, Stanley Diller (as amended and restated, the Trust). The Trust contains a no contest clause mandating the disinheritance of a beneficiary who contests the validity of a "Protected Instrument" as defined by the Trust. In the months preceding his death, Diller formed SD Sheryl Brigette, LLC (SDSB) and transferred his interest in certain assets to the company. Diller later assigned and transferred his entire interest in SDSB to his daughters in equal parts—50 percent to Rosenberg and 50 percent to Reid. Diller made the assignment "[s]ubject to the terms and conditions of the Operating Agreement of SD SHERYL BRIGETTE, LLC."

Following Diller's death, Reid brought a lawsuit against Rosenberg alleging Rosenberg unilaterally seized control of SDSB and used the company's assets for her personal gain. Reid's complaint alleged that the purported operating agreement for SDSB, which named Rosenberg as SDSB's sole member, was "null and void" as Reid never consented to the operating agreement and Rosenberg was the operating agreement's only signatory.

This appeal concerns the subsequent action filed by Rosenberg, styled as a petition for disinheritance, which seeks a declaratory judgment that Reid's lawsuit constitutes a prohibited contest under the Trust's no contest clause. Reid responded to Rosenberg's petition by filing a special motion to strike pursuant to the anti-SLAPP statute. The trial court granted the motion, concluding Rosenberg's petition arose out of Reid's protected activity—namely, Reid's lawsuit—and that Rosenberg had no probability of succeeding on the merits of her claim because the operating agreement is not a Protected Instrument

---

[1] All further unspecified code sections refer to the Code of Civil Procedure.

under the Trust's no contest clause.  Rosenberg challenges these ruling on appeal.  We affirm.

## FACTS AND PROCEDURAL BACKGROUND

1.      *The Trust and No Contest Clause*

In November 1995, Diller established the Stanley Diller Living Trust.  In September 2011, Diller restated the Trust in its entirety and executed a general assignment of assets to the Trust.  The Trust names Diller's daughters, Rosenberg and Reid, among its beneficiaries.

The Trust's "No Contest Clause" provides:  "If any person takes any action constituting a Contest . . . , then from and after the date the person takes such action, the person shall cease to be a beneficiary under this document . . . , and, if the person is an individual, all provisions hereof shall be carried out as if the individual had then died without surviving issue."

In pertinent part, the Trust defines " 'Contest' " to mean "filing a petition [or] complaint . . . in a court of law in connection with . . . seeking to obtain an adjudication that any part of any Protected Instrument is void, or seeking otherwise to void, nullify or set aside any part of any Protected Instrument on the grounds specified in California Probate Code §21310(b) without probable cause."[2]

The Trust defines " 'Protected Instrument' " to mean, in pertinent part, "the following instruments which are in existence at the time of execution of this document: . . . every document which effects the disposition of an asset either includible in the Settlor's Gross Estate or held by an irrevocable trust as to which the Settlor has contributed property."

---

[2]      Probate Code section 21310, subdivision (b) provides: " 'Direct contest' means a contest that alleges the invalidity of a protected instrument or one or more of its terms, based on one or more of the following grounds:  [¶] (1) Forgery. [¶] (2) Lack of due execution. [¶] (3) Lack of capacity. [¶] (4) Menace, duress, fraud, or undue influence. [¶] (5) Revocation of a will . . . , revocation of a trust . . . , or revocation of an instrument other than a will or trust pursuant to the procedure for revocation that is provided by statute or by the instrument. [¶] (6) Disqualification of a beneficiary . . . ."

3

2. *Formation of SDSB, Assignment to Rosenberg and Reid, and SDSB Operating Agreement*

On August 19, 2011, one month before Diller amended and restated the Trust in its entirety, Diller formed SDSB. Later that month, Diller executed documents assigning and transferring his interest in certain assets to SDSB and accepting the assignments on SDSB's behalf. The assets consisted of interests in three revenue generating properties located in Los Angeles and Long Beach.

On August 23, 2011, Diller executed an assignment transferring his entire interest in SDSB to Rosenberg and Reid in equal parts (the Assignment). The Assignment provides: "Subject to the terms and conditions of the Operating Agreement of SD SHERYL BRIGETTE, LLC, a California Limited Liability Company, Stanley Diller, Trustee of the Stanley Diller Living Trust dated November 14, 1995 ('Diller') hereby assigns and transfers separate shares of all of Diller's rights, title and interest in SD SHERYL BRIGETTE, LLC, including its membership interest as follows: [¶] 1) 50% to Sheryl Rosenberg . . . [¶] 2) 50% to BRIGETTE MARSHAK REID . . . ."

On August 23, 2011, the same day Diller executed the Assignment, Rosenberg executed a document entitled "OPERATING AGREEMENT OF SD SHERYL BRIGETTE, LLC" (the Operating Agreement). The Operating Agreement names Rosenberg as the sole Member, Managing Member and Chief Executive Officer of SDSB, and lists Rosenberg as holding "100%" of SDSB's membership interest. Among other things, the Operating Agreement sets forth the terms and conditions upon which a Member "may assign all or any part of such Member's interest" in SDSB.

3. *Reid's Lawsuit Against Rosenberg for Breach of Fiduciary Duty*

Following Diller's death in January 2012, a dispute arose between Rosenberg and Reid concerning SDSB's management and the distribution of revenues generated by the company's assets. Among other things, Reid claimed that she had not received a distribution of any profits from SDSB in either January or February 2012.

4

In June 2013, Reid filed a complaint for declaratory relief, breach of fiduciary duty, and an accounting against Rosenberg. In her operative first amended complaint, Reid alleges that Rosenberg seized control of SDSB, in derogation of the membership rights Reid received under the Assignment, by unilaterally creating and executing the Operating Agreement without Reid's consent. Reid's complaint prays for the Operating Agreement to be declared "null and void."

4.      *The Instant Lawsuit*

In February 2014, Rosenberg filed the instant lawsuit, styled as a "Petition for Declaratory Relief — Disinheritance of Brigette Reid," wherein she alleges that Reid's lawsuit challenging the Operating Agreement constitutes a "Contest" under the Trust's No Contest Clause. In support of her claim for declaratory relief, Rosenberg frames the predicate controversy as follows: "[A]n actual controversy exists between Mrs. Rosenberg and Mrs. Reid regarding the parties' respective rights under the Stanley Diller Living Trust and, in particular, the No Contest Clause. Mrs. Rosenberg contends that Mrs. Reid has violated the No Contest Clause . . . by filing the Civil Action . . . and seeking to invalidate the Operating Agreement of SDSB . . . . Mrs. Rosenberg believes that Mrs. Reid disputes such contention."[3]

---

[3]      Rosenberg's complaint also refers to Reid's partial joinder in a petition by the trustee to rescind two property transfers made by Diller that were unrelated to the SDSB assets. In granting Reid's anti-SLAPP motion with respect to the joinder, the trial court concluded that neither transfer was subject to the Trust's No Contest Clause because (1) the No Contest Clause protects only those instruments that were "in existence at the time of execution of [the Trust]" and (2) both transfers were made *after* Diller had executed the Trust. The undisputed evidence supports the trial court's conclusion and Rosenberg does not challenge the court's ruling with a reasoned argument in her appellate briefs. Accordingly, we need not address the joinder issue further. (See *AmeriGas Propane, L.P. v. Landstar Ranger, Inc*. (2010) 184 Cal.App.4th 981, 1001, fn. 4.)

5.    *Reid's Anti-SLAPP Motion*

Reid responded to Rosenberg's complaint with a special motion to strike under the anti-SLAPP statute.  Citing Rosenberg's allegation that Reid violated the No Contest Clause "[b]y filing the Civil Action," Reid argued Rosenberg's complaint plainly arose out of Reid's exercise of her protected right to engage the judicial process.  Reid further argued that Rosenberg could not prevail on her claim because Reid's lawsuit was not a "Contest" insofar as the lawsuit sought to confirm—not contest—the Assignment by which Diller transferred his entire interest in SDSB to Reid and Rosenberg in equal shares.  As for her prayer to declare the Operating Agreement null and void, Reid argued the Operating Agreement was not a Protected Instrument because it purported only to *affect* the assets Diller transferred to his daughters in the Assignment; however, the Operating Agreement did not *effect* the transfer as required to meet the definition of a Protected Instrument under the No Contest Clause.

Rosenberg opposed the motion, arguing her complaint arose out of "Reid's violation of the Trust's No Contest clause, and not Reid's petitioning activity." Rosenberg added that the anti-SLAPP statute should not apply to no contest clause enforcement actions because, by definition, "only pleadings may constitute a prohibited contest" under the Probate Code.  Hence, she argued, "[t]o hold that Rosenberg's Petition is a prohibited SLAPP would undermine the Legislative intent for both the Probate Code and the anti-SLAPP statute."

As for the merits of her declaratory relief claim, Rosenberg relied principally upon a declaration by Jance Weberman, the attorney who prepared the SDSB formation documents, the Assignment, and the Operating Agreement at Diller's request.  In his declaration, Weberman testified that Diller instructed him to form a new entity, SDSB, for which Rosenberg was to be "the sole managing member," while the "income from [SDSB's] assets [was] to be shared equally between [Rosenberg] and [Reid]."  According to Weberman, he met with Diller and Rosenberg on August 23, 2011, at which time Diller executed the Assignment and Rosenberg executed the Operating Agreement in Diller's presence.  Weberman testified that the phrase in the Assignment making Diller's

6

transfer of his interest in SDSB "[s]ubject to the terms and conditions of the Operating Agreement of SD SHERYL BRIGETTE, LLC" was meant to effectuate Diller's intention to have Rosenberg manage SDSB and its assets, while the income from the assets would be shared equally between Rosenberg and Reid. Based on this evidence, Rosenberg argued the Operating Agreement was a Protected Instrument under the No Contest Clause.

The trial court granted Reid's anti-SLAPP motion. With respect to the first prong of the anti-SLAPP analysis, the court concluded that Rosenberg's action arose out of Reid's protected petitioning activity because, absent Reid filing her complaint challenging the Operating Agreement, there would have been "no predicate for [Rosenberg] filing her Petition." As for the second prong, the court concluded Rosenberg's evidence failed to establish a likelihood of prevailing on her claim. Among other things, the court agreed with Reid that Weberman's declaration established, at most, that Diller intended the Operating Agreement to *affect* the assets he transferred to SDSB. However, because the Operating Agreement did not *effect* the transfer, the court concluded it was not a Protected Instrument and, hence, Reid's challenge to its validity did not constitute a Contest under the No Contest Clause.

## DISCUSSION

1. *The Anti-SLAPP Statute and Standard of Review*

The anti-SLAPP statute, section 425.16, provides a procedure for expeditiously resolving "nonmeritorious litigation meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue." (*Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 235.) "When served with a SLAPP suit, the defendant may immediately move to strike the complaint under section 425.16. To determine whether this motion should be granted, the trial court must engage in a two-step process." (*Hansen v. Department of Corrections & Rehabilitation* (2008) 171 Cal.App.4th 1537, 1543 (*Hansen*); *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 (*Equilon*).)

7

The first prong of the anti-SLAPP analysis requires the court to decide "whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." (*Equilon, supra,* 29 Cal.4th at p. 67; § 425.16, subd. (b)(1).) The defendant makes this showing by demonstrating the acts of which the plaintiff complains were taken "in furtherance of the [defendant's] right of petition or free speech under the United States or the California Constitution in connection with a public issue . . . ." (§ 425.16, subd. (b)(1); *Equilon,* at p. 67.) To ensure that participation in matters of public significance is not chilled, the anti-SLAPP statute mandates that its terms "shall be construed broadly." (§ 425.16, subd. (a); *Equilon,* at p. 60; see *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 23 ["The Legislature inserted the 'broad construction' provision out of concern that judicial decisions were construing [the public participation] element of the statute too narrowly"].)

If the court determines the defendant has made the threshold showing, "it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*); § 425.16, subd. (b)(1).) To establish the requisite probability of prevailing, the plaintiff need only have " 'stated and substantiated a legally sufficient claim.' " (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123.) "Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 (*Wilson*); *Navellier,* at pp. 88-89.)

We review both prongs of the anti-SLAPP analysis de novo. (*Hansen, supra,* 171 Cal.App.4th at p. 1544.) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier, supra,* 29 Cal.4th at p. 89.)

2.    *Rosenberg's Action Arises Out of Protected Activity*

Section 425.16, subdivision (e), elaborates on what constitutes an " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue.' " As pertinent here, such conduct includes "any written or oral statement or writing made before a . . . judicial proceeding." (§ 425.16, subd. (e)(1).)

In deciding whether the defendant has made the threshold showing that the plaintiff's action arises from protected activity, "a court considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' " (*Navellier, supra,* 29 Cal.4th at p. 89, quoting § 425.16, subd. (b).) As the trial court recognized here, in alleging she is entitled to a declaratory judgment that Reid violated the Trust's No Contest Clause, Rosenberg complains that Reid filed a lawsuit challenging the validity of the Operating Agreement. A lawsuit filed in a state civil court indisputably is a "statement or writing made before a . . . judicial proceeding." (§ 425.16, subd. (e)(1); *Navellier,* at p. 90.)

Rosenberg contends this analysis is erroneous. She argues her petition for disinheritance "does not seek to inhibit or chill Reid's prosecution of [Reid's lawsuit]"; rather, it "seeks a declaration as to the legal effect of [Reid's] filing, *i.e.* immediate disinheritance under the No Contest Clause." As we understand the argument, Rosenberg contends Reid was immediately disinherited under the No Contest Clause at the moment she filed her lawsuit, yet Reid continues to maintain she is a beneficiary under the Trust. Rosenberg argues her petition seeks merely to resolve her dispute with Reid about Reid's beneficiary status; the petition does not challenge Reid's right to pursue her litigation claims. Thus, Rosenberg maintains Reid's lawsuit is "only incidental to the declaratory relief cause of action," insofar as it triggered Reid's disinheritance under the No Contest Clause. We are not convinced.

Our Supreme Court's opinion in *Navellier* is instructive, if not controlling. *Navellier* concerned an ongoing dispute regarding the management of an investment fund. (*Navellier, supra,* 29 Cal.4th at p. 85.) In the first of two actions brought by the fund's original organizers, the organizers sued the fund's independent trustee in federal court, asserting claims under the Investment Company Act. (*Ibid*.) The parties reached a settlement agreement with respect to one of the claims, and the trustee signed a general release of all claims against the organizers as part of the settlement. (*Id*. at p. 86.) The organizers then filed an amended complaint reflecting the partial settlement. The trustee responded by filing counterclaims against the organizers. (*Ibid*.) Relying on the release, the organizers successfully moved for summary judgment on several of the counterclaims. A jury returned a defense verdict as to the organizers' remaining federal claims. (*Id*. at pp. 86-87.)

While the parties' appeals in the federal action were pending, the organizers in *Navellier* filed a state court action, alleging, among other things, that the trustee had committed a breach of contract by filing his federal counterclaims in violation of the release. (*Navellier, supra,* 29 Cal.4th at p. 87.) The trustee moved to strike the action as a SLAPP; the trial court denied the motion. (*Ibid.*) The Court of Appeal affirmed, concluding the action fell outside the scope of the " 'arising from' " prong "because it was not brought primarily to chill the exercise of constitutional free speech or petition rights." (*Ibid.*) The Supreme Court reversed.

Addressing the organizers' argument that the trustee's counterclaims were merely the trigger for their breach of contract claim, but not the claim's basis, the *Navellier* court responded, "The logical flaw in [the organizers'] argument is its false dichotomy between actions that target 'the formation or performance of contractual obligations' and those that target 'the exercise of the right of free speech.' " [Citation.] A given action, or cause of action, may indeed target both." (*Navellier, supra,* 29 Cal.4th at p. 92.) The Supreme Court continued, "As the facts in this lawsuit illustrate, conduct alleged to constitute breach of contract may also come within constitutionally protected speech or petitioning. The anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of

10

action but, rather, the defendant's *activity* that gives rise to his or her asserted liability-and whether that activity constitutes protected speech or petitioning." (*Ibid.*) The court concluded, "[the trustee] is being sued because of the affirmative counterclaims he filed in federal court. In fact, *but for the federal lawsuit* and [the trustee's] alleged actions taken in connection with that litigation, [the organizers'] present claims would have *no basis*. This action therefore falls squarely within the ambit of the anti-SLAPP statute's 'arising from' prong." (*Id.* at p. 90, italics added.)

The same logic defeats Rosenberg's contention in this case. As in *Navellier*, Rosenberg contends that Reid's filing of a lawsuit challenging the validity of the SDSB Operating Agreement constitutes a breach of the Trust's No Contest Clause. The fact that Rosenberg frames her claim as an action for declaratory relief, rather than breach of contract, is a distinction without difference. As the Supreme Court stated in *Navellier*, the focus of the "arising from" inquiry "is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to . . . her asserted liability." (*Navellier, supra,* 29 Cal.4th at p. 92.) Here, that activity—the filing of a lawsuit—indisputably constitutes protected petitioning. (§ 425.16, subd. (e)(1).) Indeed, just as in *Navellier*, but for Reid filing her lawsuit, Rosenberg's claim would have no basis.[4] (*Navellier,* at p. 90.)

---

[4] This fact distinguishes the instant case from *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, the case upon which Rosenberg principally relies. In *City of Cotati*, the owners of a mobile home park filed a federal court action challenging the constitutionality of a city ordinance that established a mobile home park rent stabilization program. The city, in turn, filed an action against the owners in state court, seeking a declaratory judgment that the ordinance was constitutional and valid. In reversing the trial court order striking the city's complaint as a SLAPP, our Supreme Court concluded the city's lawsuit did not arise from the owners' protected activity. While the owners' lawsuit informed the city of the broader question concerning the ordinance's constitutionality, the court reasoned that the city's lawsuit was independent of the owners' action, inasmuch as the controversy upon which the city based its declaratory relief claim—i.e., the constitutionality of the ordinance—existed with or without the owners' lawsuit. (*Id.* at pp. 79-80.) Here, in contrast, the controversy over Reid's beneficiary status is entirely dependent upon Reid's act of filing a lawsuit challenging the validity of the SDSB Operating Agreement.

11

Alternatively, Rosenberg argues the anti-SLAPP statute cannot apply to her petition because doing so would " 'in effect render' all valid No Contest clause enforcement actions SLAPPs." Rosenberg observes that, under the relevant Probate Code section defining a " 'Contest' " (Prob. Code, §§ 21310, subd. (a); see also Prob. Code, § 21311, subd. (a), "only a 'pleading' or a 'creditor's claim' violate[s] a no contest clause." Hence, she contends such actions by one subject to a no contest clause "should not be considered to be protected conduct," since regarding them as such would frustrate the Legislature's effort to simplify no contest enforcement actions by expressly including a "pleading" among the defined violations. *Navellier* dispels the supposed logic of this contention as well.

The organizers in *Navellier* advanced a similar reductio ad absurdum, arguing that applying the anti-SLAPP statute to their breach of contract claim would mean that the trustee could not be sued for breaching the release since "his alleged breach was in filing claims in court." (*Navellier, supra,* 29 Cal.4th at p. 93.) The Supreme Court rejected the contention, observing that it operated on "the fallacy that the anti-SLAPP statute allows a defendant to escape the consequences of wrongful conduct by asserting a *spurious* First Amendment defense." (*Ibid.*, italics added.) Contrary to that flawed premise, the court explained that "the statute does not bar a plaintiff from litigating an action that arises out of the defendant's free speech or petitioning [citation]; [rather,] it subjects to potential dismissal *only* those actions in which the plaintiff cannot 'state[] and substantiate[] a legally sufficient claim' [citation]." (*Ibid.*, italics added.) Thus, the court held applying the anti-SLAPP statute to such claims would not create "any kind of 'immunity' for breach of a release or of other types of contracts affecting speech" (*ibid.*); it merely meant plaintiffs must "substantiate speech-burdening claims at the outset [citation] by appending the alleged agreement to an affidavit stating the facts upon which the defendant's liability is based . . . ." (*Id.* at p. 94.)

12

Rosenberg's argument rests on the same flawed premise that the Supreme Court rejected in *Navellier*. The fact that actions to enforce a no contest clause will, due to the Probate Code's definition of " 'Contest' " (Prob. Code, § 21310, subd. (a)), in many cases arise from protected activity under the anti-SLAPP statute, does not mean a beneficiary can escape the consequences of filing a pleading that would result in a penalty under a no contest clause. On the contrary, as the Supreme Court explained in *Navellier*, applying the anti-SLAPP statute to a no contest enforcement action means only that the enforcing party must substantiate the minimal merit of a speech-burdening claim by presenting evidence that, if accepted as true, establishes the beneficiary has engaged in a prohibited contest. In view of the important rights the Legislature sought to protect by enacting the anti-SLAPP statute, this "hardly seems excessive." (*Navellier, supra,* 29 Cal.4th at p. 94.)

Having concluded Rosenberg's action arises from protected activity, we turn to the second prong of the anti-SLAPP analysis—the probability that Rosenberg will prevail on her claim.

3.      *Rosenberg Failed to Establish a Probability of Prevailing on Her Claim; The Operating Agreement Is Not a Protected Instrument*

To establish a reasonable probability of prevailing under the second prong of the anti-SLAPP analysis, "the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " (*Wilson, supra,* 28 Cal.4th at p. 821.) "In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." (*Wilson,* at p. 821.)

In the instant case, Rosenberg's probability of prevailing turns on the legal sufficiency of her claim; in particular, whether Reid's lawsuit constitutes a "Contest" challenging a "Protected Instrument" under the No Contest Clause. Reid contends it does not because her lawsuit seeks to confirm—not contest—the validity of the Assignment, by which Diller transferred his entire interest in SDSB to Rosenberg and Reid in equal parts. Reid acknowledges her lawsuit challenges the validity of the Operating Agreement, which, in contrast to the Assignment, purports to vest 100 percent of SDSB's membership interest in Rosenberg. However, Reid maintains the Operating Agreement is not a Protected Instrument under the No Contest Clause because it is not a "document which *effects* the disposition of an asset." (Italics added.)

Rosenberg counters that the Operating Agreement must be regarded as part of the transfer that the Assignment effected. Citing Weberman's declaration, Rosenberg maintains her father intended for her to be the "sole managing member," as provided by the Operating Agreement, while the "income from [SDSB's] assets [was] to be shared equally" with Reid. That intention, Rosenberg contends, also is evidenced by the Assignment's preamble, which states Diller's transfer of his interest in SDSB is made "[s]ubject to the terms and conditions of the Operating Agreement of SD SHERYL BRIGETTE, LLC." Based on this evidence, Rosenberg argues "the transaction contemplated by [Diller] . . . was not complete and could not be completed as he intended without the Operating Agreement." Hence, Rosenberg maintains, "[b]y attacking the Operating Agreement, [Reid] necessarily attacked the Assignment as well."

There are at least two problems with Rosenberg's proffered construction of the Assignment and No Contest Clause. First, with respect to the Assignment's "[s]ubject to" clause, though the clause refers to "the terms and conditions of the Operating Agreement of SD SHERYL BRIGETTE, LLC," there are no terms or conditions in the Operating Agreement executed by Rosenberg on August 23, 2011 that could possibly govern *Diller's* transfer of *his* interest in SDSB. In pertinent part, the Operating Agreement executed by Rosenberg governs the conduct of a SDSB "Member," including the terms and conditions upon which a Member "may assign all or any part of such

14

Member's interest" in SDSB. Critically, Diller is not a "Member" under this Operating Agreement; rather, the sole Member, Managing Member and Chief Executive Officer of SDSB under that Operating Agreement is Rosenberg, and she holds "100%" of SDSB's membership interest. Accordingly, the Operating Agreement that Rosenberg executed could not govern *Diller's* transfer of *his* interest in SDSB because Diller is not a Member under that Operating Agreement. Insofar as Reid's lawsuit seeks to confirm the Assignment by challenging the apparently contradictory terms of the Operating Agreement Rosenberg executed, we agree with Reid that her action does not constitute a "Contest" under the Trust's No Contest Clause.

Second, with respect to the testimony in Weberman's declaration, though we can infer from this testimony that Diller intended the Operating Agreement to govern SDSB's management and profit distributions *after* Diller's transfer, the testimony does not support Rosenberg's contention that the Operating Agreement is itself a "Protected Instrument" under the No Contest Clause. As relevant here, the No Contest Clause defines the term " 'Protected Instrument' " to mean "every document which *effects* the disposition of an asset." (Italics added.) Focusing on that definition, the trial court astutely reasoned that the Operating Agreement is not a Protected Instrument because "it only 'affects' (i.e. to produce an effect on or influence in some way) the transfer of [Diller's] interest in SDSB[;] [i]t does not effect (i.e. bring about or make happen) the transfer of [Diller's] rights, title and interest in SDSB, including [his] 'membership interest.' " Insofar as Probate Code section 21312 directs that "a no contest clause shall be strictly construed," the difference between "affect" and "effect" was a proper—indeed, mandatory—distinction for the trial court to draw. (See also *Estate of Basore* (1971) 19 Cal.App.3d 623, 630 [no contest clauses "must be strictly construed [citation], and no wider scope is to be given to their language than is plainly required"; "[o]nly where an act comes strictly within the express terms of the forfeiture clause may a breach thereof be declared"].) The trial court properly concluded that Reid's lawsuit did not constitute a "Contest" of a "Protected Instrument" under the Trust's No Contest Clause. Rosenberg failed to demonstrate the legal sufficiency of her complaint.

15

## DISPOSITION

The order striking the complaint is affirmed.  Reid is entitled to her costs on appeal.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KITCHING, J.[*]

We concur:

EDMON, P. J.

ALDRICH, J.

---

[*]     Retired Associate Justice of the Court of Appeal, Second Appellate. District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16